WEBB v. BUICK MOTOR CO.

1. MASTER AND SERVANT—PERSONAL INJURIES—NEGLIGENCE—VICE PRINCIPAL.

Where the superintendent of a factory ordered an employee to chip pieces out of certain cast-iron frames, and the chips tended to fly into an adjoining passageway employed by plaintiff who worked in other · departments under a different superintendent, defendant was liable for the failure to erect a screen or other protection.[1]

[1] As to the liability of the master for injuries caused by splinters flying from hammers or chisels, punches, and other similar tools, see notes in 13 L. R. A. (N. S.) 679; 30 L. R. A. (N. S.) 800, and 40 L. R. A. (N. S.) 832.

The question of vice-principalship as determined with reference to character of act causing injury is discussed in a note in 54 L. R. A. 37.

2. SAME—SUPERINTENDENT—ALTER EGO.

A superintendent of the construction department of an extensive automobile factory, who was subject only to the authority of the defendant, and whose duties were to plan and supervise the construction work in all parts of the establishment, and do the work by his subordinates, having under him an assistant and foreman, was not a fellow-servant with an employee in the stock department, who was injured by the superintendent's neglect to use a guard or screen to prevent flying chips; for the duty which was violated. was a duty which the master might not delegate so as to escape liability. His knowledge of surrounding conditions was chargeable to the employer.

3. SAME.

Nor is the doctrine of safe place made inapplicable because the work of chipping frames was temporary: defendant's duty required the maintenance of a safe passageway for plaintiff in the ordinary scope of his employment.

4. SAME—EXPECTED RESULT.

The court could not hold, as matter of law, that the accident was one which defendant need not have anticipated, when it was clear that the chips were liable to fly and strike some of the servants of the defendant.

5. SAME—ASSUMED RISK—NEGLIGENCE.

And the rule of assumed risk did not bar plaintiff's recovery where new dangers were created by the employer of which plaintiff had no notice or knowledge, unless the dangers were shown to have been such that it was negligent on plaintiff's part not to have seen and avoided them.

Error to Genesee; Wisner, J. Submitted June 11, 1914. (Docket No. 72.)    Decided October 2, 1914.

Case by George Webb against the Buick Motor Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Carton & Bray*, for appellant.

*Brennan, Cook & Gundry*, for appellee.

STEERE, J. In this action of tort brought to recover damages for the accidental loss of an eye charged to

have been caused by defendant's negligence, plaintiff was awarded a verdict and judgment for $1,741, in the circuit court of Genesee county.

The injury was inflicted by a flying chip from a cast-iron frame upon which a workman was chiseling, striking plaintiff in the eye as he was walking along a passageway adjacent to where such work was in progress.

The grounds of negligence charged and relied upon are, in substance, that defendant failed to furnish plaintiff, who was one of its employees, a safe place in which to perform his duties; that it knowingly and negligently ordered the chipping to be done, and failed to erect screens and coverings around the work to prevent the chips flying, or to place barriers across the passageway, or to notify plaintiff that such work was there being done and of its attendant dangers.

Defendant's grounds for reversal are, as condensed from its numerous assignments of error and briefly stated: That no actionable negligence has been shown because, under the admitted facts and testimony in the case, the doctrine of safe place and nondelegable duty does not apply; the accident and injury could not have reasonably been anticipated and was caused by the happening of a remote contingency; the work of chipping was temporary or transitory in its nature, being connected with an equipment or construction job, was unknown and unauthorized by defendant, was the act of a fellow-servant, and plaintiff assumed the risk.

Defendant was a corporation engaged in the manufacture of automobiles in the city of Flint, having in its service over 5,000 employees working in different departments and buildings of its establishment. In its business organization there were various distinct departments in charge of superintendents, with assistant superintendents and foremen under them; the

various departments for the most part being located, or having headquarters, in separate buildings. The assembly plant, where the cars were put together and tested, was in a large two-story structure called "Factory Buliding No. 10," and was in charge of a superintendent named Edsall. On the first floor of this building were three large rooms known as the finishing, paint, and assembly rooms. The assembly room, in which plaintiff was injured, was 400 feet long and 72 feet wide, with a center aisle or passageway running through it north and south, lengthwise of the building, the remainder of the room on each side, of the passageway being occupied by machinery, tools, material and workmen as the nature and needs of the business of assembling required. The superintendent's office was at the extreme south end of this floor. On the day of the accident, December 29, 1910, the assembly room was not running full force, though the number of men then working in that room is variously stated by different witnesses at from 60 or 80 to 200. Some men belonging to the construction department were also working in the room upon a job of installing what are designated as "mechanical testers." The construction department had its headquarters in another building, and was under a superintendent named MacAfee. The work of this department ranged from factory to factory all over the plant, wherever and whenever occasion demanded. On the day of the accident the men of the construction department working in the assembly room were engaged, under direction of their own foreman, named Duryea, in erecting and fitting steel frames, or stands, for the metal chassis of the automobiles to rest upon in testing. These mechanical testers were mostly designed and the patterns prepared by MacAfee, the superintendent of construction. They were made by his department, and were being erected in the assembly

room by his men under his supervision.    In the progress of the work it was found necessary to remove a triangular piece from each corner post or "leg" of the cast-iron, rectangular frame of the tester, and he directed the foreman to have a sufficient piece cut out, or the leg cut down to properly fit, by the men chipping or chiseling off the triangle with a cold chisel and hammer.    There were two rows or sets of these metal frames on each side of the center passageway. MacAfee testified that it was his duty to look after the construction work within the factories; that he ordered the chipping to be done, and it had been going on at intervals for about two weeks when plaintiff was injured.

Plaintiff did not belong to either the assembly or construction department, but was employed in the stock department, under a different superintendent, and was directly under a foreman named Oakley, who was located in the basement of building No. 10, in charge of a room where the finishing stock was kept, and plaintiff's headquarters were with him. Plaintiff's duties consisted of caring for this finishing stock and delivering it when needed, as it might be called for.    On the day in question Oakley directed him to take some "cuff plates," or running board brass, to the foreman in the finishing room, which he did, and was then directed by that foreman to deliver them at the superintendent's office, located on the same floor at the south end.    His most direct route was south on that floor from the finishing room, through the paint shop and along the passageway through the assembly room.    On his way and just as he entered the assembly room he met Edsall, superintendent of that department, to whose office he was directed to take the material, and showed the latter what he was carrying.    Edsall said to him "Take them to the office * * * and give them to Mr. Delmore."    Continuing on his

way along the passage towards the office a flying piece of metal struck him in the left eye. The sight was destroyed, and it ultimately became necessary to remove the eye. His knowledge of what the missile was, where it came from, and what caused it to fly was after-acquired. The cause and details are related by others who were present. Plaintiff testified that the passageway, with which he was familiar, was clear and unobstructed, that he thought it was about 10 feet wide, and that officers of defendant, its workmen, and others who had occasion, were accustomed to use it; that there was the noise of running machinery, pounding, and other usual sounds of work going on in different parts of the room, but he had no knowledge or notice that this chipping was being done, or any kind of work which made the passage dangerous; that he did not stop or pay any particular attention to what was being done, and walked right along about his own business, his mind being on his mission.

It was shown that the piece of metal which inflicted this injury flew from a "horse," or frame, on the east side of the passageway upon which one of the construction men, named Ebear, was chipping. He testifies:

"I did not see Mr. Webb when he came through there. I saw him a minute after he was struck. Just immediately prior to his being struck I was chipping a casting out of one of the legs of the test. Mr. Duryea instructed me to do it. * * * Mr. Duryea understood about the work. * * * He told us to use a chisel and hammer. We did it just as we were told. * * * I know who chipped off the chip that struck Mr. Webb. I did. It flew from the blow of the hammer on the chisel. I did not see him when he was struck. Mr. Craw was working right beside me at the time, at my right. When we saw Mr. Webb was struck, Mr. Craw spoke to me and swore. * * * I ran up to Mr. Webb then.

* * * I catched him by the arm and walked down to the desk with him."

In submitting the case to the jury the court said:

"I charge you as a matter of law, Mr. MacAfee was a vice principal and his knowledge was the knowledge of the company. He directed the change in the standards and approved the method of making the change, that is, the chipping, and if you find that a man of ordinary care and caution under all the circumstances would have made provision to protect the employees liable to pass along the alley from the flying chips, having regard to the probability of injury to such employees, would have erected shields or barriers or given notice of danger, then you will be warranted in finding the defendant guilty of negligence."

In the brief of defendant's counsel MacAfee is designated as a "foreman" who was instructed to do certain work, in which he made a mistake, necessitating this chipping, and it is said:

"When it was discovered that this change had to be made, several of the frames had already been installed and fastened together, and Mr. MacAfee did not consult the company or its officials, nor tell them about it, but directed that the small piece in question be chiseled off with a cold chisel and hammer, as the best and cheapest way under the circumstances."

It is argued that this resulted from his mistake, of which defendant had no knowledge or notice, and for which it was not responsible.

It appears without question from the record that MacAfee was superintendent of the construction department, in charge of a distinct organization of the plant, with his office and headquarters in a different building. The only one having any authority over him being defendant itself. His duties were to plan, look after, and superintend the construction work in all parts of the establishment, and to do the work with his own men. After receiving general instructions as

to what was desired by defendant, the details were delegated to him, and he had the full control and management of his department, with an assistant and foremen working under him according to his instructions. He says of this work:

"The proposition was put up to me to build these mechanical testers of a certain design, giving me the idea and asking me to get out the patterns, which I proceeded to do, using my own pattern maker, my own workmen putting that thing into operation. * * * After we had assembled a few of them, the foreman I had in charge of the work came to me and told me the chassis would not fit. * * * I ordered them cut to fit. * * * I assumed the responsibility of giving those orders. * * * I directed the men in my employ to cut that off; that was the only way it could be done successfully. * * * I was brought in consultation with the foreman there on the job. * * * That was my judgment of it, to cut it off with a chisel and hammer. I knew those chips would fly some, to be sure. I knew if they hit anybody it was liable to hurt; if it struck anybody in the eye it was liable to put the eye out; that is the supposition."

Witness also testified that he gave no instructions to put up shields or screens to prevent chips flying; and if that ought to be have been done he thought it would be the duty of his department to do it, but that he had no idea any one would be struck in the eye by those chips when he ordered the chipping done.

The questions of who is a vice-principal or a fellow-servant and what is the same employment are often difficult to determine and have been reviewed in endless decisions which, necessarily depending upon and varying according to the circumstances of each case, can often only be reconciled or distinguished by a full analysis of the evidence in each particular case.

We are well satisfied that the conclusion reached and instructions given by the trial court, holding as a matter of law under the undisputed facts that Superin-

tendent MacAfee was a vice-principal or *alter ego* of defendant are well founded in reason and sustained by abundant authority. The subject is exhaustively reviewed, with numerous citations of authorities in Labatt on Master & Servant (2d Ed.), §§ 1479-1553. In section 1582 it is said:

"The doctrine discussed in chapter 65, *ante,* is manifestly no bar to a servant's action, where the particular detail of the work which caused the injury was carried out under the superintendence, or by the direction, of the master himself, or of one of those employees who are deemed to be vice-principals by virtue of their rank."

Here the work was done by direction of one we deem a vice-principal. The controlling elements as applied to this case are well stated in *Dixon* v. *Ironworks,* 90 Minn. 492 (97 N. W. 375), where, after stating them, it was held a so-called superintendent was not, in respect to the negligence charged, a vice-principal, and in *Hunn* v. *Railroad Co.,* 78 Mich. 513 (44 N. W. 502, 7 L. R. A. 500), wherein it is said:

"The master may not choose to give his personal attention to his business, and may desire to put another in his place, to manage and control it for him as fully as he might do if personally present. Such person is his *alter ego,* and the master is as responsible for his acts of omission and commission, while engaged in the business intrusted to him, as if he did such acts himself. It is the duty of the master to supervise, direct, and control the operations and management of his business, so that no injury shall ensue to his employees through his own carelessness or negligence in carrying it on, or else to furnish some person who will do so, and for whom he must stand sponsor. This is true of natural persons, and it is especially true of corporations, who can only act through natural persons. Whenever the business conducted by the person selected by the master is such that the person selected is invested with full control (subject to no one's supervision except the master's) over the action of the em-

ployees engaged in carrying on a particular branch of the master's business, and, acting upon his own discretion, according to general instructions laid down for his guidance, it is his province to direct, and the duty of the employees to obey, then he stands in the place of the master, and is not a fellow-servant with those whom he controls."

The foregoing conclusion also negatives the contention that the work of chipping in the assembly room was unknown and unauthorized by defendant. MacAfee ordered it, and knew when and where it was done. He also knew that the chips would fly and if they hit any one they were liable to inflict injury. His knowledge as vice-principal was defendant's knowledge. It is not shown, or claimed, that the work of chipping in itself was improperly or negligently done by Ebear. He was doing it just as directed. The negligence charged is a failure to perform the nondelegable duty of preventing the chips flying to where they were liable to injure others, or to warn of the resulting increased danger in using this passageway.

It is urged that the doctrine of safe place and nondelegable duty does not apply because installing these testers, with incidental chipping, was a temporary, construction job, preparatory to carrying on the regular manufacturing work of defendant in that building; that the work was being done by the construction department and would soon end on completion of the installation. But it is also shown that in the completed building where this chipping was done the regular work of defendant in the manufacture of automobiles, as applied to the department for which that building was intended, was in progress as usual, equipped with its material, machinery, and workmen, organized and running as a separate department. Plaintiff's services were furnishing supplies to that department. He was in no way connected with or assisting in the construc-

tion work. No alterations in the passageway had been made or were in progress. It had been provided by defendant as a necessary and convenient and safe way for its employees while performing their duties there, and was constantly in use as such. In itself it was safe as before. It was not only the duty of defendant to make it safe, but to keep it safe. The kind of work begun and in progress adjacent to it by order of the vice-principal without providing safeguards or notice to those using it raises the question of negligence involved.

The familiar case of *Beesley* v. *Wheeler & Co.*, 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266), cited by defendant, points out the distinction. It was there held that all workmen under the charge of one superintendent engaged in the common service of constructing, or building, a ship were fellow-servants, and it is said of the facts there involved:

"The case is different from those where the master furnishes a permanent place to work, as in a ship or factory. A master's duty in such a case is to make and keep the place reasonably safe; but that rule would apply as to those working in, but not necessarily as to those constructing, the factory. Such employees would not be fellow-servants with each other, for the enterprises would not be the same. The service of one would be the erection of the completed factory; that of the other its use for the purpose for which it was designed."

Plaintiff's services were in connection with the use of the building for the purpose for which it was designed. This work of chipping in connection with installing the testers, while temporary in the sense that it would not permanently and indefinitely continue, was not a mere incident, of a short time only. MacAfee stated it had been going on about two weeks, and it was the intention to equip the assembly room with

these testing stands. Ebear states they had then chipped either eight or nine sets of horses, and plaintiff testifies that in his judgment there were about 40 sets of horses on the east side of the passageway. It can well be contended that the regular workmen in a running factory, if not entitled to the same protection as at other times, when changes are being made and new machinery installed, are at least entitled to reasonable protection compatible with existing conditions, by barriers or due notice against new dangers resulting from the disturbed surroundings.

It is urged that the court under the facts shown should have held as a conclusion of law the accident was such that it could not reasonably have been anticipated, and was caused by the happening of a remote contingency. It may be conceded that no one could foresee or reasonably anticipate that this particular accident would happen just when and as it did, but the test upon that proposition is whether the work, where and as conducted, was of such a nature and so dangerous, it should reasonably have been anticipated that some one whose duties called him there was likely or liable to be injured. We have referred to MacAfee's testimony as to his knowledge that chips would fly and the possible results. Ebear testifies of this:

"I was working on the east side of the building. From the passageway to where Mr. Webb went by I should judge it was between 15 and 20 feet. While I was working these chips that I chipped off flew all over. Some of them struck way the other side of the room; went west across this passageway. I could not say with what velocity. They would strike the west wall, some of them would. They ran all the way from an eighth of an inch to an inch long; they were about one-eighth to one-half inch thick. They flew westerly mostly. I could not say with what force they went. Some would go across the building, some halfway. * * * There could have been a sheet iron or something of that kind set up there that would have

prevented these chips from flying across the passage-way. A screen could have been used if it had been fine enough."

The legal duty of an employer to safeguard against, or warn workmen of, the danger from particles thrown by clipping, shearing, or other cutting of metals has more than once been recognized in cases somewhat similar to, though not identical with, this. *Smith* v. *Manufacturing Co.,* 56 App. Div. (N. Y.) 528 (67 N. Y. Supp. 533); *Choate* v. *Mill Co.,* 27 Ont. App. 155; *Brockmiller* v. *Industrial Works,* 148 Mich. 642 (112 N. W. 688). In 4 Thompson on Negligence (2d Ed.), § 3969, it is said:

"The owner of a mill in which iron or steel is being chiseled, chipped, or cut, is bound to exercise reasonable care and to supply reasonable devices to prevent his servants from being injured by flying chips, splinters, or fragments of the metal; and where the exercise of reasonable care demands such a precaution, he is bound to adopt some system, or make and enforce reasonable rules, devised for the prevention of accidents of this nature, and his negligence in this particular will generally be a question for a jury."

The testimony introduced by plaintiff in this case sufficed to make the question of defendant's negligence in that particular a question for the jury.

It is urged that plaintiff assumed the risk. The rule of assumption of risk has no application where, as claimed here, new dangers are created by the employer of which the workman had no notice or knowledge, unless the dangers were such that it was negligence on his part to fail to notice and avoid them. The question of plaintiff's contributory negligence was submitted to the jury under proper instructions. We find no reversible error in this record.

Judgment is affirmed.

MCALVAY, C. J., and BROOKE, STONE, MOORE, and BIRD, JJ., concurred with STEERE, J.

OSTRANDER, J. In my opinion the doctrine of vice-principal, as applied to MacAfee, is not involved. The doctrine of safe place is involved, and in my view the conclusion stated by Mr. Justice STEERE is the correct one.

KUHN, J., concurred with OSTRANDER, J.